**PYRAMID SECURITIES LIMITED, Plaintiff,**

v.

**INTERNATIONAL BANK, Defendant.**

**Civ. A. No. 87–3541 (CRR).**

United States District Court, District of Columbia.

Dec. 19, 1989.

---

Michael J. McManus, Warren Lutz, and Michael S. Levine of Jackson & Campbell, P.C., Washington, D.C., for plaintiff.

Sheila J. Carpenter, Bruce R. Hegyi, and Robert A. Spencer of Sutherland, Asbill & Brennan, Washington, D.C., for defendant.

## OPINION

CHARLES R. RICHEY, District Judge.

Pyramid Securities Limited ("Pyramid") has sued International Bank ("International") for compensatory and punitive damages. Pyramid charges International with violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statutes, 18 U.S.C. §§ 1962(c), (d) and also raises fraud, breach of contract, and other state law claims. International has filed a motion to dismiss, or in the alternative, for summary judgment. The Court will grant the defendant's motion for summary judgment because: (1) there is no genuine issue of material fact on the "pattern" element of Pyramid's RICO claim and (2) due to the lack of diversity between the parties, the Court does not have subject matter jurisdiction over Pyramid's remaining state law claims, which, in any event, would have to be dismissed as time-barred.

### I. Factual Background

The connection between Pyramid and International in the context of this lawsuit, is not immediately apparent. Therefore, the Court will briefly explain the various links in this litigation chain, accepting as true for the purposes of deciding this motion, most of Pyramid's allegations. Pyramid is a British Virgin Islands corporation with its principal place of business in the Cayman Islands, British West Indies. At the outset, this dispute arose out of a business relationship between Pyramid and Washington International Bank and Trust Limited ("WIBT"), which is located in the Cayman Islands and organized and licensed under Cayman Islands law. Pyramid owned and traded stocks and other securities for its own account, and it paid WIBT commissions to administer Pyramid's accounts with various brokerage houses, serve as Pyramid's agent in investment and banking matters, and perform certain bookkeeping and accounting functions for Pyramid. WIBT was a subsidiary of the defendant International, an Arizona corporation with its principal place of business in the District of Columbia.

Nicholas J. Duggan, WIBT's President and Manager, personally oversaw WIBT's activities relating to Pyramid. In June of 1981, upon Duggan's recommendation, Pyramid entered into an agreement with Linda Pearson and E.F. Hutton & Co. ("Hutton"), making Pearson and Hutton securities brokers on Pyramid's behalf. Pearson and Hutton sold and purchased securities on Pyramid's behalf for over two months, but on or about August 31, 1981 Pyramid's President, Edward J. Attridge, told Duggan and WIBT, as well as Pearson and Hutton, that all trading on Pyramid's account should cease. In spite of this directive, Pearson "churned" Pyramid's account from the beginning of September 1981 (when Pearson apparently knew that Attridge was in Hawaii on his honeymoon) until about the end of November 1981 (when Attridge returned from his honeymoon and discovered the churning). Pearson's unauthorized trading of approximately $4.5 million worth of stock through Pyramid's account reduced the value of the account from about $890,000 to $40,000.

In November 1981, when Attridge first discovered Pearson's unauthorized trading, he made inquiries of WIBT, which usually received telexes from brokers, including Hutton, confirming transactions involving Pyramid's accounts. According to Pyramid, WIBT disclaimed any knowledge of Pearson's churning of Pyramid's accounts and stated that it had not received any trade confirmations from Hutton since August 31, 1981. In 1983 Pyramid brought suit against Pearson and Hutton, and in December 1985 Pyramid recovered $850,000 from Hutton pursuant to a settlement agreement.

At some point during the Hutton litigation, Pyramid learned that WIBT and its officers participated in the churning; that they knew of the unauthorized trades before they were completed; and that they had recorded these trades in a "secret" ledger. Armed with this newly discovered information and believing that the settlement with Hutton did not fully compensate

it for its damages, Pyramid filed suit against, *inter alia,* WIBT and International in the Southern District of Florida. However, Judge Marcus dismissed the case because the Cayman Islands "citizenship" of both Pyramid and WIBT meant that there was not complete diversity between the parties.

At long last, we arrive at the final link in the chain: Pyramid's filing of this suit, in which International is the only named defendant. Pyramid's Complaint charges International with: (1) breach of contract, (2) breach of fiduciary duty, (3) negligence, (4) civil conspiracy, (5) fraud, and (6) violations of the RICO statutes. Relying exclusively on a "piercing the corporate veil" theory to hold International liable for WIBT's wrongful acts, Pyramid alleges that International "has continually exercised substantial control over the operations of WIB[T]" and that "[s]uch control and domination ... has rendered WIB[T] a 'mere instrumentality' of International ..., thereby rendering International ... liable for the wrongful acts of its subsidiary WIB[T]." Complaint ¶ 38. International has now filed a renewed dispositive motion.[1] Both parties having presented—and the Court having considered—matters outside the pleading, the Court will treat International's motion as one for summary judgment. *See* Fed.R. Civ.Proc. 12(b), 56.

## II. Analysis

■ Rule 56(c) of the Federal Rules of Civil Procedure requires that the Court grant a motion for summary judgment if the pleadings and supporting affidavits and other submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Moreover, it is well-established that the Court must believe the non-movant's evidence and must draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

### A. The RICO Claims

Pyramid alleges that International (through the acts of its "dominated" subsidiary WIBT), Duggan, Pearson, and Hutton violated and conspired to violate the RICO laws, 18 U.S.C. §§ 1962(c), (d), and also that WIBT and Duggan conspired to conceal those violations from Pyramid. Both parties agree that a violation of § 1962(c) consists of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Pyramid alleges that WIBT, Duggan, Pearson, and Hutton conducted "racketeering activity," *see* § 1961(1), consisting of, *inter alia:* securities fraud, mail fraud, wire fraud, and conspiracy to violate RICO. Moreover, Duggan, WIBT, Pearson, and Hutton allegedly formed an enterprise (a so-called "association-in-fact") for the legitimate trading of securities long before Pearson's churning of Pyramid's account.

■ Assuming for the purposes of this discussion that Pyramid could withstand summary judgment on these other elements of RICO,[2] Pyramid has failed to

---

1. By prior Order filed December 29, 1988, the Court considered International's initial motion to dismiss. In that Order the Court stated: "[T]he record before it lacks sufficient development to permit the dismissal [International] seeks. Yet, at the same time, the present state of the record does suggest that certain of International's contentions ... may have merit if properly supported." The Court therefore denied International's motion to dismiss without prejudice, permitted additional time for further discovery, and gave both parties the opportunity to submit dispositive motions at the close of further discovery.

2. In light of the Court's holding announced herein, it need not address International's other arguments that Pyramid has failed to establish both an enterprise and racketeering activity conducted by International or WIBT and Duggan. Other arguments raised by International in one or both of its motions to dismiss that the Court does not now need to address include: the inapplicability of RICO to activities taking

raise a genuine issue of material fact regarding the "pattern" element. A pattern is an essential element of both the § 1962(c) claim and the § 1962(d) RICO conspiracy claim, which is predicated solely upon the alleged § 1962(c) violation.[3] Since Pyramid has failed to establish the pattern element, International is entitled to judgment as a matter of law on both RICO claims.

In *H.J., Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court recently attempted to clarify what a plaintiff must show to satisfy the "pattern" element of a RICO claim. The Court emphasized that:

> the section of the statute headed "definitions," 18 U.S.C. § 1961, does not so much define a pattern of racketeering activity as state a *minimum necessary condition* for the existence of such a pattern. Unlike other provisions in § 1961 that tell us what various concepts used in [RICO] "mean," § 1961(5) says of the phrase "pattern of racketeering activity" only that it "requires at least two acts of racketeering activity ... [occurring within a ten-year period]." It thus places an outer limit on the concept of a pattern of racketeering activity that is broad indeed.

*Id.* 109 S.Ct. at 2899 (emphasis added). The *H.J.* Court then went on to expand upon the idea, previously mentioned in *Sedima,* that "while two acts are necessary, they may not be sufficient." *Id.* (quoting *Sedima,* 479 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14).

■ If it was at all unclear before *H.J.,* it is now established that merely proving two predicate acts without more is insufficient to satisfy the pattern element of a RICO claim. An analysis of RICO's legislative history led the *H.J.* Court to conclude that "continuity plus relationship" produce a "pattern." *Id.* 109 S.Ct. at 2900. Thus, in addition to satisfying the statutory prerequisite of showing at least two predicate acts, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original).

Even if Pyramid's allegations and supporting documents are sufficient to show two or more related predicate acts, Pyramid has failed to raise a genuine issue of material fact on the continuity prong of the pattern element. *H.J.* established two methods for demonstrating continuity: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902.

place outside of the United States, WIBT's status as an indispensable party, *forum non conveniens,* prior satisfaction, and Cayman Islands law on piercing the corporate veil.

**3.** The pattern element is equally significant in a RICO conspiracy claim based upon § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of ... [§ 1962(c)].") as it is in a RICO claim based upon § 1962(c). The issue in RICO cases comes down to whether there was conduct of, or a conspiracy to conduct, an enterprise through a pattern of racketeering activity, and therefore either way the question of pattern plays a determinative role. *See Shearin v. E.F. Hutton Group,* 885 F.2d 1162, 1169 (3d Cir.1989) ("All that need be shown is that the conspirators agreed to engage in a pattern of racketeering activity."); *United States v. Brooklier,* 685 F.2d 1208, 1222 (9th Cir.1982) ("If the agreement or combination is undertaken to establish or participate in an enterprise and to do it through a pattern of racketeering, there is a conspiracy to commit the underlying RICO offense."), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 1195, 75 L.Ed.2d 439 (1983); *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.) ("Thus, the object of a RICO conspiracy is to violate a substantive RICO provision—here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity—and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *Medallion TV Enterprises v. SelecTV,* 627 F.Supp. 1290, 1301 (C.D.Cal.1986) ("Plainitffs [sic] have produced no evidence, and the Court can discern none, raising a genuine issue of fact that defendants conspired to engage in a 'pattern' of racketeering activity."), *aff'd on other grounds,* 833 F.2d 1360 (9th Cir. 1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

### (1) Threat of Continued Criminal Activity

■ There is nothing on this record from which the Court can infer that the predicate acts alleged by Pyramid by their nature constitute a *threat* of continued racketeering activity. This conclusion is buttressed by a comparison between the instant case and the scenarios used by the *H.J.* Court as illustrative, albeit non-exhaustive, examples of racketeering acts threatening future criminal conduct. The churning of Pyramid's account is qualitatively different from the Supreme Court's scenarios, in which a hypothetical "hoodlum" extorts money from storekeepers, telling them that he will reappear once every month to collect his "premium," or "in which the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

Unlike the *H.J.* Court's examples, the scheme to churn Pyramid's account simply does not pose a threat of continued racketeering activity nor is there any indication on the record that churning is part of International's regular way of doing business. *Compare United States v. Alexander,* 888 F.2d 777, 778 (11th Cir.1989) (*H.J.*'s threat of continued criminal activity requirement satisfied because school board official extorted, or conspired to extort, money each year from 1977 to 1984 and would have continued to do so); *United States v. Kaplan,* 886 F.2d 536, 542–43 (2d Cir.1989) (applying *H.J.* to hold pattern element satisfied, even though predicate acts consisted of only two instances of bribing city officials; "external facts" of defendant's willingness to facilitate corruption generally within government agency and his pursuit of another bribery scheme at time when investigation halted further activities would permit finding that predicate acts entailed threat of continuing racketeering activity); *Combs v. Bakker,* 886 F.2d 673, 677–78 (4th Cir.1989) (applying *H.J.* to hold that scheme, in which interstate wire and mail facilities were allegedly used to fraudulently sell partnerships in "PTL" enterprise to over 55,000 individual victims, amounted to threat of continued criminal activity and satisfied pattern element).

### (2) Closed Period of Repeated Conduct

■ Pyramid fares no better in demonstrating continuity by attempting to show a "closed period of repeated conduct." The *H.J.* Court seemed to have exactly this type of case in mind when it stated:

> [Continuity] is ... centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates *extending over a substantial period of time.* Predicate acts *extending over a few weeks or months* and threatening no future criminal conduct *do not satisfy this requirement:* Congress was concerned in RICO with *long-term criminal conduct.*

*H.J.,* 109 S.Ct. at 2902 (emphasis added). The Court then went on to reverse the dismissal of a RICO claim, which alleged that *many* defendants (Northwestern Bell Telephone Company officers and employees, members of the Minnesota Public Utilities Commission (MPUC), and other unnamed individuals and corporations) had bribed five members of the MPUC over *at least a six-year period,* causing injury to *many victims* (a class consisting of customers of the telephone company). *See id.* at 2897, 2906. In light of *H.J.*'s language—even resolving all justifiable inferences in Pyramid's favor—the Court holds that the churning of Pyramid's account over a period of no more than three months, with the alleged active participation and assistance of WIBT and Duggan, does not amount to long-term criminal conduct within the reach of RICO.

■ In an apparent attempt to conform its Complaint to the recent changes in RICO jurisprudence wrought by *H.J.,* Pyramid in its opposition to International's renewed motion for the first time argues a "concealment of racketeering" theory. Under this theory, the pattern of racketeering activity allegedly "consisted of a variety of predicate acts committed by WIBT and Duggan from September 1981 through at least 1985." Pyramid Renewed Opposition at 18. The Court disagrees with Pyramid's characterization of this three-month-long

churning scheme as a pattern of racketeering activity lasting for over four years. The conspiracy—and the racketeering activity for purposes of deciding whether the continuity prong of RICO's "pattern" element has been satisfied—both terminated around the end of November 1981 when Pyramid first discovered the churning by Pearson and Hutton.[4]

In addition to relying upon *H.J.* itself for guidance, this Court reached its conclusion after engaging in the kind of flexible, common-sense, fact-specific analysis contemplated by *H.J.*, 109 S.Ct. at 2901–02. As discussed above, continuity is primarily a temporal concept, but other relevant factors include: (i) the number and variety of predicate acts; (ii) the number of victims; (iii) the number of perpetrators; (iv)

the presence of separate schemes; and (v) the occurrence of distinct injuries. *See Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 504 (4th Cir.1989) (applying *H.J.*); *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989) (same); *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir.1989) (same).[5] Not only was the churning in this case of limited duration, but on this record it was nothing more than one narrowly circumscribed scheme involving essentially similar predicate acts with one victim suffering one economic injury.

Moreover, a review of circuit court cases that have applied *H.J.*'s "closed period of repeated conduct" theory demonstrates that the churning of Pyramid's account did not amount to long-term criminal activity.[6]

**4.** Pyramid alleges that, in an effort to conceal their involvement in the churning scheme, WIBT and Duggan committed mail and wire fraud, as well as perjury, in furtherance of the conspiracy. It is true that the use of the mails or wires to conceal fraud may itself violate the mail or wire fraud statutes. *See, e.g., United States v. Lane,* 474 U.S. 438, 451, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); *SEC v. Holschuh,* 694 F.2d 130, 143–44 (7th Cir.1982). However, Pyramid's argument fails because this general proposition of law is true only if the post-fraud use of interstate mail or wire facilities was for the purpose of "executing the scheme" and avoiding detection of the fraud by "lulling" the victims into a false sense of security. *See Lane,* 474 U.S. at 451, 106 S.Ct. at 733; *Holschuh,* 694 F.2d at 143–44.

Pyramid erroneously equates "concealment of a fraud" with "concealment of a party's involvement in an already-discovered fraud" and therefore misapplies this general proposition to the facts of this case. The record is crystal clear that Pyramid discovered Pearson and Hutton's churning of its accounts no later than the end of November 1981. That is when the fraud was discovered and when Pyramid began investigating the churning and preparing to take legal action against Pearson and Hutton, the prime executors of the scheme who have since paid Pyramid $850,000 in settlement of Pyramid's separate suit against them. Even assuming that the acts of concealment occurred and continued through 1985 as alleged, Pyramid had already discovered the churning so the only possible concealment was of WIBT and Duggan's involvement in the scheme. Because Pyramid could not have been "lulled" into a false sense of security once it discovered the churning, the conspiracy and the pattern of racketeering activity did not extend beyond the end of November 1981. *See United States v. Steele,* 685 F.2d 793, 801 (3d Cir.1982) (illegal conspiracy and con-

cealment objective terminated, as a matter of law, no later than date of prime defendant's disclosure of bribery scheme to law enforcement officials; therefore, any subsequent uses of wires and mails by prime defendant and other defendants could not have furthered illegal conspiracy).

**5.** Notwithstanding Pyramid's arguments to the contrary, *H.J.* did not prohibit courts from engaging in this type of case-by-case analysis of various factors relevant to the continuity issue. The *H.J.* Court did not hold that the presence or absence of multiple schemes is irrelevant or that the courts may not analyze this issue as one, non-determinative factor in deciding whether continuity has been established. *See H.J.*, 109 S.Ct. at 2901 ("[A]lthough proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." (emphasis in original)); *Sutherland v. O'Malley,* 882 F.2d 1196, 1204 (7th Cir.1989) ("[I]t is not irrelevant, in analyzing the continuity requirement, that there is only one scheme.").

**6.** Apparently, *H.J.*'s impact on the District of Columbia Circuit's RICO jurisprudence has not yet been precisely delineated. The United States Court of Appeals for this Circuit most recently addressed the continuity issue in *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132 (D.C.Cir. 1989) (Mikva, J., with Wald, C.J. and Edwards, J.), a case which previously had been vacated and remanded by the Supreme Court for further consideration in light of *H.J. See Yellow Bus Lines,* —— U.S. ——, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989). In a brief discussion of *H.J.* and the

The instant case has many parallels with *Parcoil Corp.*, 887 F.2d at 503, in which the racketeering activity consisted of a contractor instructing its subcontractor to use one composition of sand in "fracturing" the plaintiff's oil and gas wells but write another composition on the invoices. Consequently, the subcontractor sent the plaintiff seventeen falsified reports over a four-month period. *Id.* The Fourth Circuit stated that "[i]t takes scant analysis to discern that this is not the type of continuity contemplated by *H.J.*," *id.* at 504, and affirmed the district court's grant of summary judgment.

In *Sutherland v. O'Malley*, 882 F.2d 1196 (7th Cir.1989), the Seventh Circuit also applied *H.J.* to hold that the plaintiff failed to satisfy the continuity prong of RICO's pattern element. The plaintiff charged O'Malley, who had been the plaintiff's co-counsel in a personal injury action, with a RICO violation (predicated on extortion and multiple acts of mail fraud) after O'Malley allegedly diverted settlement checks away from the plaintiff and refused to pay the plaintiff her share of the contingency fee. The Seventh Circuit held that the predicate acts relied upon by the plaintiff neither amounted to, nor constituted a threat of, continuing racketeering activity. *Id.* at 1205. Several factors, all equally applicable to the instant case, contributed to this conclusion: there was "only one dishonest undertaking" accomplished "in a single five-month period" with "only one victim" who suffered "only one distinct economic injury." *Sutherland*, 882 F.2d at 1204–05.

Another case that is analogous to the case before the Court is *Menasco, Inc. v.*

pattern issue, the panel reversed the district court's dismissal of RICO claims, holding that "[w]hile the 'continuity' of the alleged predicate acts is a closer question [than their 'relatedness'] because of the relatively short duration of the strike, these acts could, if proved, establish 'a distinct threat of long-term racketeering activity, either explicit or implicit.'" *Yellow Bus Lines*, 883 F.2d at 145. What significance this Court should attach to the *Yellow Bus Lines* panel opinion is unclear because on October 17, 1989 the Court of Appeals granted rehearing *en banc.* Thus, at least for the time being, this Court will also turn to cases from other circuits for guidance in how to apply *H.J.*

*Wasserman*, 886 F.2d 681 (4th Cir.1989). Wasserman allegedly violated the RICO laws by pursuing a scheme to defraud two corporations of their investments in oil and gas properties. *Id.* at 682. The Fourth Circuit affirmed the district court's dismissal of the RICO claim for failure to allege a pattern of racketeering activity. Explaining its conclusion that the plaintiff's allegations did not satisfy the continuity prong, the appellate court emphasized that: (i) the defendant's actions "were narrowly directed towards a single fraudulent goal"; (ii) "[t]hey involved a limited purpose"; (iii) "[t]hey involved but one perpetrator"; (iv) "[t]hey involved but one set of victims"; and (v) "the transaction took place over approximately one year." *Id.* at 684.

Applying the same analysis to the record before this Court reveals that all of *Wasserman*'s factors (except the number of perpetrators involved) favor the same finding of lack of continuity in this case, especially considering that the *Wasserman* scheme lasted four times longer than the churning of Pyramid's account for three months. Furthermore, the three cases discussed above, which held that continuity was not established, involved schemes lasting between four months and one year. By comparison, *H.J.* itself and those post-*H.J.* cases holding that the plaintiff's allegations satisfied the "closed period of repeated conduct" version of continuity all had something, as set forth in the margin, that the instant case does not: a scheme or schemes lasting two or more years (the one exception being a fourteen-month-long scheme) and, in most cases, also multiple victims or multiple schemes.[7]

7. *See Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir.1989) (continuity established by duration of predicate acts of mail and wire fraud committed as part of scheme lasting more than four years); *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 994–95 (8th Cir.1989) (in addition to lasting "for over three years," defendants' defrauding of subcontractors involved two "schemes," "different victims," and "a complex series of activities," such as creation of "numerous corporate entities"); *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir.1989) ("three perpetrators [were allegedly] involved in at least one open-ended scheme to defraud presumably numerous investors and ... honest employees as

Consequently, the Court, mindful of its responsibility to read the RICO statute broadly, *see H.J.*, 109 S.Ct. at 2905; *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), nevertheless must hold that on this record Pyramid has failed to raise a genuine issue of material fact as to whether the churning amounted to, or posed a threat of, continued criminal activity.[8] As the *Wasserman* court insightfully observed:

> This case presents a paradigm of one in which no pattern of racketeering activity is present. If the pattern requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud from being transformed into a federal RICO claim. If we were to recognize a RICO claim based on the narrow fraud alleged here, the pattern requirement would be rendered meaningless. We refuse, as did *H.J., Inc.*, to read the statutory term as surplusage.

*Wasserman*, 886 F.2d at 685 (4th Cir.1989) (citations omitted).

### B. The Remaining State Law Claims

In addition to invoking this Court's jurisdiction by relying upon the federal question presented by its RICO claim, Pyramid also alleges that the Court's jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. With the dismissal of the RICO claim, as discussed above, the federal question disappears, and diversity becomes the only possible basis for the Court to exercise jurisdiction over Pyramid's remaining state law claims.

▬ At first glance, there seems to be complete diversity between Pyramid (an alien) and International (a citizen of Arizona and the District of Columbia). However, the issue is not that clear-cut because WIBT, International's subsidiary, is also an alien.[9] Although WIBT is not named as a defendant in this suit, Pyramid's claims against International are, in every respect, based exclusively upon WIBT's alleged misconduct. Pyramid repeatedly alleges and argues that International's complete control and domination of WIBT rendered WIBT a "mere instrumentality" of International and that therefore International should be liable for WIBT's wrongful acts.

Pyramid's theory of "piercing the corporate veil" and holding International vicariously liable for the misfeasance of its sub-

---

well—a scheme that lasted at least … two years"); *Swistock v. Jones*, 884 F.2d 755, 759 (3d Cir.1989) (scheme to defraud in connection with defendants' lease of coal-producing properties to plaintiffs involved numerous acts of mail and wire fraud over fourteen-month period); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) (mail and wire fraud, extortion, larceny, and other acts allegedly committed to deprive plaintiff of interest in real estate enterprise extended over "a matter of years, from 1980 until the filing of this action"); *United States v. Gelb*, 881 F.2d 1155, 1164 (2d Cir.) (defendant's schemes to avoid paying postage on mass mailings "were conducted for about five years, and but for their discovery surely would have continued"), *cert. denied*, — U.S. —, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989).

8. This conclusion by no means implies that the churning scheme alleged by Pyramid was lawful or that Pyramid was left unarmed without a remedy for any injury caused by the churning. As previously mentioned, *supra* note 4, Pyramid has received a substantial settlement payment from Pearson and Hutton. Moreover, Pyramid had other "weapons" at its disposal. As the rest of the Complaint indicates, Pyramid has resorted to various other theories based upon alleged violations of state law. This Court's holding means nothing more than that Pyramid may not use the most powerful weapon in its arsenal, because the civil RICO "bazooka" was not designed to attack activities, such as the churning of Pyramid's account, which do not "amount to or threaten long-term criminal activity." *H.J.*, 109 S.Ct. at 2902 n. 4.

9. Noting that "WIBT is no longer a part of [International], having been sold in January, 1989, approximately one year following the commencement of this suit," Pyramid argues that "WIBT is not pertinent to [International's] contrived efforts to destroy diversity jurisdiction." Pyramid Renewed Opposition at 24. However, as explained in more detail below, WIBT's citizenship is pertinent and indeed outcome-determinative. In any event, it is completely irrelevant that WIBT has since been sold because federal courts must look to the citizenship of the parties *on the date the complaint was filed* to determine whether they have diversity jurisdiction. *See, e.g., Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957); *Hawes v. Club Ecuestre El Commandante*, 598 F.2d 698, 701 (1st Cir.1979). The record is clear that when this suit was filed WIBT was International's subsidiary and was a Cayman Islands corporation.

sidiary implicates one of the more arcane areas of diversity jurisdiction law: whether the subsidiary's citizenship should be imputed to the parent corporation. It is true, as Pyramid contends, that "subsidiary and parent corporations are generally considered to be separate entities for diversity jurisdiction purposes." *U.S.I. Properties Corp. v. M.D. Constr. Co.,* 860 F.2d 1, 7 (1st Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). But this by no means completes the analysis required to determine International's citizenship for the purposes of this Court's jurisdiction.[10]

Although the proposition of law cited above is generally correct, several courts have recognized and applied an "alter ego" exception when the parent corporation is being sued solely for the acts of its completely controlled subsidiary. In *Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553 (5th Cir.1985), for example, the court vacated and remanded due to its "serious doubts" about the district court's subject matter jurisdiction and held "that Northwest, as alter ego of First Commercial [Northwest's wholly-owned subsidiary], acquired the Colorado citizenship of First Commercial for purposes of subject matter jurisdiction of this action." *Id.* at 558; *see Kuehne & Nagel (AG & Co.) v. Geosource, Inc.,* 874 F.2d 283, 291 (5th Cir.1989) ("no diversity jurisdiction existed to entertain the action of the alien plaintiff ... against Geosource, because Geosource is also an alien once it assumes the residence of [its alter ego subsidiary]"); *Chesco Co. v. National Gypsum Co.,* 649 F.Supp. 65, 66–67 (E.D.N.Y.1986) (even if court assumes that National Gypsum and its wholly-owned subsidiary are one corporate entity, court would dismiss for lack of complete diversity because both subsidiary and plaintiff are incorporated in New York).

■ Thus, for purposes of diversity jurisdiction, a corporation may have multiple citizenships: its place of incorporation, its principal place of business, and the place of incorporation of its alter ego subsidiary. *Panalpina Welttransport GMBH v. Geosource, Inc.,* 764 F.2d 352, 354 (5th Cir. 1985). The *Panalpina* court's language is particularly appropriate in this case:

> [T]he alter ego doctrine may be used to add places of citizenship to the abrogation of diversity jurisdiction.... Consistent therewith, if a parent were sued as a result of activities of a subsidiary, the alter ego doctrine would attribute the subsidiary's place of incorporation to the parent *even if such resulted in destroying complete diversity.*

*Id.* at 354–55 (emphasis added).

This Court is persuaded by the reasoning of the above-cited cases discussing and applying the alter ego doctrine. A question of such fundamental importance as the subject matter jurisdiction of the federal judiciary should be decided without "elevat[ing] form over substance." *Freeman,* 754 F.2d at 557. If a parent corporation wholly dominates its subsidiary, then they are in substance one entity, and a federal court should not exercise diversity jurisdiction if that "conclusion can be reached only by blind adherence to form and equally blind disregard of the facts." *Id.* at 558. Moreover, it is settled law that the statute conferring federal jurisdiction should be strictly construed. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Whitelock v. Leatherman,* 460 F.2d 507, 514 (10th Cir.1972). Finally, the alter ego doctrine is entirely consistent with Congress' intent, in enacting 28 U.S.C. § 1332(c) and assigning corporations multiple citizenships, to reduce the number of diversity cases filed in federal court. *See Freeman,* 754 F.2d at 558 (citing S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin.News 3099, 3101–02); 1 *Moore's Federal Practice* ¶ 0.78[2], at 723.55 & n. 26 (same).

10. In *U.S.I. Properties,* as in most of the other cases addressing the parent-subsidiary diversity jurisdiction issue, the plaintiff sued the subsidiary and attempted to impute the parent corporation's citizenship to the subsidiary. It is unclear whether the same standards should apply when the roles are reversed and the defendant is the parent company attempting to assume the citizenship of its subsidiary, whose wrongful acts are the only basis for holding the parent liable.

To put it bluntly, if this were a coin toss, Pyramid would be calling both "heads" and "tails." All six of the counts in its Complaint allege that International is liable solely because of the wrongful acts of International's completely controlled and dominated subsidiary. Therefore, Pyramid's entire case against International hinges on this Court's accepting its "piercing the corporate veil" theory. But at the same time, Pyramid argues on the diversity jurisdiction issue that a defendant corporation's "corporate veil is generally not to be pierced for the purpose of aggregating its corporate incidents with those of its subsidiary companies." Pyramid Renewed Opposition at 25 (quoting *Horwat v. Paulsen-Webber Cordage Corp.*, 336 F.Supp. 1020, 1021 (W.D.Pa.1971)).[11]

Either way, Pyramid's remaining state law claims must be dismissed. If WIBT was not International's alter ego, then Pyramid may not hold International liable for wrongful acts that, as Pyramid itself alleges, were committed not by International but by its subsidiary WIBT. If, however, WIBT was International's alter ego, then International (taking on WIBT's foreign citizenship) and Pyramid are both aliens and this Court does not have diversity jurisdiction. *See* 28 U.S.C. § 1332. Because Pyramid's position in its Complaint and many subsequent pleadings has consistently been—with the one exception noted above—that International completely dominated its wholly-owned subsidiary WIBT, the Court will apply the alter ego doctrine and dismiss the remaining state law claims for lack of subject matter jurisdiction.

■■■ Assuming *arguendo* that this Court has jurisdiction based on complete diversity between the parties, the remaining state law claims must nevertheless be dismissed as time-barred. Pyramid argues, and the Court accepts as true, that WIBT and Duggan's fraudulent concealment of their involvement in the churning tolled the statute of limitations. Since the "fraudulent concealment tolls a statute of limitations only for so long as the concealment endures," *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 996 (D.C.1978), the Court must determine the date on which Pyramid knew, or by the exercise of due diligence should have known, that it may have had a cause of action against International. *See Westinghouse Elec. Corp. v. City of Burlington, Vermont*, 351 F.2d 762, 764 (D.C.Cir.1965); *Bailey v. Greenberg*, 516 A.2d 934, 941 (D.C.1986).

International's argument, supported by a certain amount of persuasive evidence, is that Pyramid discovered WIBT and Duggan's involvement in the churning no later than November 14, 1984. International contends that on or about that date Pyramid, through its attorney, received from WIBT a copy of a "confidential" securities mail register, in which WIBT had recorded its receipt of trade confirmation invoices and telexes from Pearson or Hutton during the three-month churning period. Indeed, the words of Pyramid's own President, sworn to in an affidavit filed during one of Pyramid's prior lawsuits in the United States District Court for the Southern District of Florida, support International's argument in no uncertain terms: "It was from that securities mail register, which was first produced in November of *1984*, that I learned [WIBT] had, in fact, received on a timely basis the confirmations or invoices for each of the unauthorized trades in and out of Pyramid's account." Attridge Affidavit ¶ 14, International Motion to Dismiss Exhibit E (emphasis in original).

Moreover, International has also presented the Court with copies of letters from WIBT's accountant to Attridge dated Octo-

---

11. As Pyramid notes, International may also have taken inconsistent positions by arguing, on the one hand, that it should not be held liable because WIBT was a separate and distinct entity and, on the other hand, that there is no diversity jurisdiction because International assumes WIBT's alien citizenship under the alter ego doctrine. However, International's inconsistency, if any, is irrelevant on this issue because it is well-established that when diversity is challenged, the party asserting federal jurisdiction—in this case Pyramid—has the burden of proof. *E.g., Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Hawes v. Club Ecuestre El Commandante*, 598 F.2d 698, 702 (1st Cir.1979). On this record, Pyramid has failed to carry its burden.

ber 21 and December 2, 1981, both of which are almost identical and state respectively: "We enclose herewith copies of contract notes received in respect of purchases and sales of securities [for Pyramid Securities Limited]" during the month of September/during the months of October and November 1981. International Motion to Dismiss Exhibit D. Pyramid was therefore put on notice that there had been some activity in its account from September through November 1981. Even if, as Pyramid argues, these letters failed to put Pyramid on notice that there had been any trading by *Hutton* (as opposed to trading by one of Pyramid's numerous other brokers), International has submitted a copy of a letter from WIBT's accountant to Attridge dated *February 18, 1982* that specifically mentions Hutton: "We also enclose herewith contract notes received to date in respect of purchases and sales by E.F. Hutton & Co., relating to purchase and sale of stock in [three named companies]." *Id.* Moreover, this letter indicates that a copy was sent to Pyramid's accounting firm, Coopers & Lybrand.

Consisting of affidavits of its President and its accountants, Pyramid's response to those pieces of evidence is simply insufficient to satisfy Fed.R.Civ.Proc. 56(e) and preclude summary judgment on the statute of limitations issue.[12] In the Court's view, a reasonable finder of fact would conclude that Pyramid knew, or reasonably should have known, by no later than November 14, 1984 that WIBT had been involved in the three-month-long churning of its account. Both parties agree, and the Court concurs, that the statute of limitations on Pyramid's common law claims is three years. *See* D.C.Code Ann. §§ 12–301(7) (applies to

breach of contract,), 12–301(8) (applies to breach of fiduciary duty, negligence, civil conspiracy, and fraud). Because Pyramid waited from November 14, 1984 until December 31, 1987 to file this suit, the Court, if it had subject matter jurisdiction, would dismiss Pyramid's remaining state law claims as time-barred.

### III. Conclusion

The Court grants International's motion for summary judgment on Pyramid's RICO claims because Pyramid has failed to raise a genuine issue of material fact as to whether the three-month-long churning scheme satisfies the "continuity" prong of RICO's pattern element. The Court further holds that it does not have subject matter jurisdiction over the remaining state law claims because there is no diversity between Pyramid, an alien, and International, which under the alter ego doctrine assumes the alien citizenship of its dominated subsidiary WIBT. However, even if the Court could properly assert diversity jurisdiction, it would grant summary judgment because Pyramid's remaining state law claims are barred by the various statutes of limitations.

An Order in accordance with the foregoing Opinion will be issued of even date herewith.

---

**12.** Attridge's sworn statements that he did not know of WIBT's involvement until December of 1985 do nothing more than contradict his affidavit quoted above that was filed in prior litigation in the Southern District of Florida. While these unexplained inconsistent affidavits may create some dispute about the credibility of any of Attridge's statements, they are not sufficient to rise to the level of creating a genuine issue of material fact. Moreover, although Pyramid's two Coopers & Lybrand accountants deny receipt of the letters allegedly sent to them by WIBT's accountant in the end of 1981, Pyramid

Opposition to Motion to Dismiss, Exhibits 6, 7, neither of these affidavits in any way denies receipt of the damaging February 18, 1982 letter from WIBT's accountant, which specifically mentions trading by Hutton and provides a company-by-company list of the stock held by Hutton in Pyramid's account. Thus, on the record before the Court, the February 18, 1982 letter putting Pyramid on notice of WIBT's involvement in the churning is rebutted by nothing more than the affidavit of the plaintiff's President.